FILED ☒  ___ LODGED
___ RECEIVED  ___ COPY

JAN 1 5 2008

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

REDACTED FOR
PUBLIC DISCLOSURE

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America | NO: CR08-0036-PHX-PGR (DKD) |
| Plaintiff, | |
| v. | **INDICTMENT** |
| | VIO: 18 U.S.C. § 371 |
| 1.Timothy K. Isaac, | (Conspiracy) |
| (Counts 1-31) | Count 1 |
| | |
| 2.Bryan P. Gillette, | 21 U.S.C. §§ 331(a), 333(a)(2), |
| (Counts 1-31) | 352(a), 352(e), 352(o), 353(b)(4) |
| | (Introducing Misbranded Drugs |
| 3.Laura C. Gillette, | into Interstate Commerce) |
| (Counts 1-31) | Counts 2-7 |
| | |
| 4.Ultra Health Laboratories, Inc., | 21 U.S.C. §§ 331(p), 333(a)(2), 360 |
| (Counts 1-31) | (Failure to Register an Establishment |
| | in Which Drugs are Manufactured, |
| 5.Ultra Health Products, Inc., | Prepared, Propagated, Compounded, |
| (Counts 1-31) | or Processed) |
| | Counts 8-9 |
| 6.Bionate International, Inc., | |
| (Counts 1-31) | 21 U.S.C. §§ 331(a), 333(a)(2), 343(a) |
| | (Introducing Misbranded Foods |
| 7.Johnston-Keay Laboratories, Inc., | into Interstate Commerce) |
| (Counts 1-31) | Counts 10-15 |
| | |
| Defendants. | 18 U.S.C. § 1341 |
| | (Mail Fraud) |
| | Counts 16-20 |

18 U.S.C. § 1343
(Wire Fraud)
Counts 21-25

18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)
Count 26

18 U.S.C. § 1956(a)(1)(A)(i)
(Promotional Money Laundering)
Counts 27-29

18 U.S.C. § 1957(a)
(Transactional Money Laundering)
Counts 30-31

18 U.S.C. § 982(a)(1)
(Criminal Forfeiture)

18 U.S.C. § 2
(Aiding and Abetting)

THE GRAND JURY CHARGES:

## INTRODUCTION

At times material to this Indictment:

### The Food and Drug Administration's Regulation of Prescription Drugs and Dietary Supplements

1.      The United States Food and Drug Administration (the "FDA") was the agency of the United States charged with the responsibility of protecting the health and safety of the American public by assuring, among other things, that drugs sold for administration to humans were safe and effective for their intended uses and bore labeling containing complete, true, and accurate information.  The FDA's responsibilities included regulating the

labels, labeling, distribution, and manufacture of drugs shipped or received in interstate commerce.   The FDA's responsibilities also included inspecting facilities where drug products were manufactured, labeled, and packaged; examining the records at such facilities to determine whether the drugs were manufactured, labeled, and packaged under conditions whereby their quality could be assured; examining the facilities and controls used; and, where appropriate, preventing products that were improperly manufactured, labeled, and packaged from reaching the marketplace.

2.    In order to legally market a drug in interstate commerce, the drug's manufacturer was required to comply with all applicable provisions of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act"), 21 U.S.C. § 321, et seq., and its implementing regulations.   The FDA was responsible for enforcing the provisions of the FD&C Act.

3.    The FD&C Act defined the term "drug" to include articles that (1) were intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man; or (2) were intended to affect the structure or any function of the body of man.   21 U.S.C. § 321(g)(1)(B) and (C).

4.    Some drugs regulated by the FDA were considered "prescription drugs." "Prescription drugs" were those drugs that, because of their toxicity and other potential harmful effects, were not safe for use except under the supervision of a practitioner licensed by law to administer such drugs.   21 U.S.C. § 353(b)(1)(A).   The FDA, as a condition of approving a drug to be placed on the market, could require that drug to be administered under the supervision of a practitioner licensed by law to administer such drugs.   21 U.S.C. § 353(b)(1)(B).   Supervision of a licensed practitioner was a matter of state law and

generally required physicians to take measures such as conducting a physical examination and other appropriate testing of the patients as may be necessary, obtaining a medical history, discussing risks and benefits of treatment, maintaining treatment records, and providing appropriate follow-up care to ensure that a patient is being effectively treated and does not suffer serious side effects.  A drug approved as a prescription drug was required to bear the symbol "Rx only" on its label.  21 U.S.C. § 353(b)(4)(A).

5.    "Viagra" was a drug product with the established name of "sildenafil citrate," which was indicated to treat erectile dysfunction, and was a prescription drug within the meaning of 21 U.S.C. §§ 353(b)(1)(A) and (B).  The FDA approved Viagra for marketing in March, 1998.

6.    Viagra was made by Pfizer, Inc., which was the only company that had an approved New Drug Application on file with the FDA for sildenafil citrate and thus was the only company that could legally market this prescription drug in the United States.

7.    Sildenafil citrate was a prescription drug because of its effect on the human body.  Sildenafil citrate opened capillaries, which increased the blood flow and heart rate.  Clinical trials conducted by Pfizer and reviewed by the FDA resulted in the posting of possible adverse reactions in all sildenafil citrate product literature.  Licensed practitioners were warned by Pfizer labeling that persons on heart medications (such as Plavix) and/or blood-thinning medications (such as Coumadin) could suffer a heart attack or stroke if they used sildenafil citrate.  Pfizer, as the distributor of Viagra, advised doctors not to prescribe Viagra to any patients with heart conditions, warning that the effects of Viagra could cause blood pressure to drop to an unsafe or life-threatening level.

8.    In addition to its responsibilities with regard to drugs, the FDA also was charged with the responsibility of protecting the health and safety of the American public by assuring, among other things, that "food" intended for human consumption was not adulterated or misbranded.  The FD&C Act defined the term "food" to include articles that (1) were used for food or drink for man; or (2) were used for components of any such article.  21 U.S.C. § 321(f)(1) and (3).

9.    Under the FD&C Act, a "dietary supplement" was deemed to be a food.  The FD&C Act defined the term "dietary supplement" to mean a product intended to supplement the diet that contained one or more specified ingredients and, among other things, was labeled as a dietary supplement.  A product was not considered a dietary supplement if it contained an ingredient, such as sildenafil citrate, which the FDA had approved as a drug, or if the product made claims that were considered drug claims.  21 U.S.C. § 321(ff).

10.    Because they were considered to be foods, and not drugs, under the FD&C Act, dietary supplements were not subject to any of the FDA's extensive pre-market regulatory authority.  21 U.S.C. § 355.  Similarly, manufacturers and marketers of dietary supplements were subject to less rigorous facility inspections than were drug manufacturers and marketers.

11.    Under the FD&C Act, the term "label" meant a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k).

12.    Under the FD&C Act, the term "labeling" meant all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.  21 U.S.C. § 321(m).

## Prohibited Acts

13.     The FD&C Act required any establishment that engaged in the manufacture, preparation, propagation, compounding, or processing of a drug to register with FDA in accordance with 21 U.S.C. § 360.   The failure to register was a prohibited act under the FD&C Act. 21 U.S.C. § 331(p).

14.     The FD&C Act prohibited the introduction or delivery for introduction into interstate commerce, or the causing thereof, of any drug or food that was misbranded or adulterated. 21 U.S.C. § 331(a).

## Misbranded Drugs

15.     Under the FD&C Act, a drug was deemed to be misbranded:

   1) if its labeling was false or misleading in any particular, 21 U.S.C. § 352(a); or

   2) if the label did not bear the established name and quantity of each active ingredient, 21 U.S.C. § 352(e)(1)(A); or

   3) if it was manufactured, prepared, or processed in an establishment in any State not duly registered with the FDA, 21 U.S.C. § 352(o); or

   4) if it was a prescription drug and was not dispensed pursuant to a prescription of a practitioner licensed by law to administer such drug, 21 U.S.C. § 353(b)(1); or

   5) if it was a prescription drug and its label did not bear the symbol "Rx only," 21 U.S.C. § 353(b)(4).

**Misbranded Foods**

16.     Under the FD&C Act, a food was deemed to be misbranded if its labeling was false or misleading in any particular.  21 U.S.C. § 343(a).

**Adulterated Drugs**

17.     Under the FD&C Act, a drug was deemed adulterated if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding did not conform to or were not operated or administered in conformity with current good manufacturing practice to assure that such drug met the requirements of the FD&C Act as to safety and had the identity and strength, and met the quality and purity characteristics, which it purported or was represented to possess.  21 U.S.C. § 351(a)(2)(B).

**The Defendants**

18.     Defendant ULTRA HEALTH LABORATORIES, INC. ("UHLI") was a business incorporated in the State of Arizona, and was located at 3249 East Harbour Drive, Phoenix, Arizona.  Defendant UHLI described its business as developing nutritional supplements through proprietary manufacturing processes.

19.     Defendant ULTRA HEALTH PRODUCTS, INC. ("UHP"), was a wholly-owned subsidiary of defendant UHLI.  Defendant UHP was a business incorporated in the State of Arizona, and it was located at various locations in the Phoenix metropolitan area, including 2026 West Lone Cactus Road, Phoenix, Arizona, and 2031 West Melinda Lane, Phoenix, Arizona.  Defendant UHP manufactured and packaged nutritional supplements and

other products, both as a contract manufacturer and as the manufacturer and packager of defendant UHLI's products.

20.     Defendant BIONATE INTERNATIONAL, INC. ("BIONATE") was a wholly-owned subsidiary of defendant UHLI.  Defendant BIONATE was a business incorporated in the State of Arizona, and it was located at 3249 East Harbour Drive, Phoenix, Arizona. Defendant BIONATE was established to market and distribute defendant UHLI's products.

21.     Defendant JOHNSTON-KEAY LABORATORIES, INC. ("JOHNSTON-KEAY") was a business incorporated in the State of Nevada, and it was located at 7000 North 16th Street, Suite 120-454, Phoenix, Arizona.  Defendant JOHNSTON-KEAY issued invoices and received payments for products manufactured by defendant UHP and marketed by defendant BIONATE.

22.     Defendant TIMOTHY K. ISAAC ("ISAAC") was the President and Owner of defendants UHP, BIONATE, and JOHNSTON-KEAY.  Defendant ISAAC also was a shareholder, director, and/or officer of defendants UHLI, UHP, BIONATE, and JOHNSTON-KEAY.  Defendant ISAAC resided at 7000 North 47th Street, Paradise Valley, Arizona.

23.     Defendant BRYAN P. GILLETTE ("BRYAN GILLETTE") was the Vice President and plant manager for defendant UHP.  Defendant BRYAN GILLETTE began working for defendant ISAAC in approximately 1998.  Defendant BRYAN GILLETTE resided at 7616 North Tatum Boulevard, Paradise Valley, Arizona.

24.     Defendant LAURA C. GILLETTE ("LAURA GILLETTE") was employed by defendant ISAAC at defendant UHP.  Defendant LAURA GILLETTE was married to

defendant BRYAN GILLETTE.   Defendant LAURA GILLETTE resided at 7616 North Tatum Boulevard, Paradise Valley, Arizona.

## COUNT 1

### (Conspiracy)

25.    The factual allegations of paragraphs 1 through 24 above are realleged and incorporated herein by reference.

26.    Beginning at a time unknown to the Grand Jury, but at least as early as on or about November 2001, and continuing through at least on or about July 2003, the exact dates being unknown to the Grand Jury, in the District of Arizona and elsewhere, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., did knowingly and willfully agree and conspire with each other and others, known and unknown to the Grand Jury, to commit one or all of the following offenses against the United States:

    a.    Title 21, United States Code, Section 352(a), (e), and (o), with the intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2) (Introducing Misbranded Drugs into Interstate Commerce);

    b.    Title 21, United States Code, Section 353(b)(1) and (4), with the intent to defraud and mislead, in violation of Title 21, United States Code,

Sections 331(a) and (k) and 333(a)(2) (Introducing Misbranded Prescription Drugs into Interstate Commerce);

c.    Title 21, United States Code, Section 343(a), with the intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2) (Introducing Misbranded Foods into Interstate Commerce);

d.    Title 21, United States Code, Section 351(a)(2)(B), with the intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2) (Introducing Adulterated Drugs Into Interstate Commerce);

e.    Title 21, United States Code, Section 360, with the intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331(p) and 333(a)(2) (Failure to Register an Establishment in Which Drugs are Manufactured, Prepared, Propagated, Compounded, or Processed);

f.    Title 18, United States Code, Section 545 (Smuggling Goods Into the United States);

g.    Title 18, United States Code, Section 1341 (Mail Fraud); and

h.    Title 18, United States Code, Section 1343 (Wire Fraud).

## OBJECTS OF THE CONSPIRACY

27.     The objects of the conspiracy were:

a.      to smuggle sildenafil citrate from China into the United States without the knowledge of United States government authorities;

b.      to manufacture and distribute in interstate commerce to consumers and other distributors a misbranded and adulterated drug, namely sildenafil citrate, marketed as "Vinarol," a claimed dietary supplement purportedly containing a proprietary blend called "VASX" of herbs and other natural ingredients;

c.      to manufacture and distribute in interstate commerce to consumers and other distributors a misbranded food, namely the dietary supplement Vinarol; and

d.      to avoid appropriate government regulation of the manufacture and distribution of Vinarol.

## MANNER AND MEANS OF THE CONSPIRACY
## AND THE SCHEME TO DEFRAUD

28.     The manner and means used by the defendants and others known and unknown to the Grand Jury to carry out the objects of the conspiracy, and the scheme and artifice to defraud, included the following:

a.      Defendants illegally imported sildenafil citrate from China by mixing it with other herbal products to mask its color and texture and by falsely

describing the product on U.S. Customs Service forms and other documents as "Nutrition Granule," "Zhen Ren Nutrition Granule," "Diphosphate," "Fructose-1,6-Diphosphate," and "VASX Nutritional Granule";

b.    Defendants manufactured a product called Vinarol, which they claimed was a dietary supplement that would provide sexual enhancement, but which they knew in fact contained the prescription drug sildenafil citrate in an amount similar to the quantity used by Pfizer, Inc. in Viagra;

c.    Defendants failed to inform the FDA, as required, that they were manufacturing drug products;

d.    When the FDA, during a routine inspection in June 2002, observed the drug guaifinesin (used in some cough syrups) being manufactured at defendants' facility and informed defendants that they were required to register as a drug establishment, defendants concealed from the FDA the fact that they also were manufacturing the drug sildenafil citrate and falsely represented that they would register as a drug manufacturer in the future;

e.    Through websites known and unknown to the Grand Jury, operated through persons and entities known and unknown to the Grand Jury, and through other distributors, defendants advertised, offered for sale, sold, and dispensed Vinarol to individual consumers and other wholesale and retail distributors;

f.  Defendants' advertisements and labeling for Vinarol falsely and fraudulently stated that Vinarol was made from a "100% Natural Herbal Formula" and that Vinarol was a "100% all-natural herbal product," when defendants knew that Vinarol in fact contained sildenafil citrate;

g.  Defendants' advertisements and labeling for Vinarol falsely and fraudulently omitted the fact that sildenafil citrate was the active ingredient in Vinarol;

h.  Defendants' advertisements and labeling for Vinarol falsely and fraudulently stated that there was "No Doctor's Visit or Prescription Required" to obtain Vinarol and that "Vinarol does not require any costly or embarrassing doctor's visit or prescription," and Vinarol's label did not bear the symbol "Rx only."  In fact, sildenafil citrate (which could legally be marketed in the United States only by Pfizer, under the name Viagra) was classified as a prescription drug that could not be dispensed other than pursuant to a prescription from a practitioner licensed by law to administer prescription drugs;

i.  Defendants' advertisements for Vinarol falsely and fraudulently stated that Vinarol was "an all-natural formulation with no chemical side effects" and that "[b]ecause it's all-natural, it works in minutes with no side effects."  In fact, sildenafil citrate should not have been taken by persons on heart medications and/or blood-thinning medications, who could suffer a heart attack or stroke if they used sildenafil citrate;

j.    Defendants did not require consumers to provide any form of prescription before receiving Vinarol;

k.    Defendants entered into marketing and other agreements with persons and entities known and unknown to the Grand Jury, in order to increase sales of Vinarol;

l.    Between on or about February 2002 through on or about April 2003, defendants caused to be filled consumer requests for Vinarol, which was sent to customers via United States Postal Service and via commercial interstate carriers, including United Parcel Service;

m.    Defendants received payments for Vinarol orders from consumers and distributors in various ways, including credit card and check;

n.    Defendants repeatedly denied to distributors and other customers and potential customers that Vinarol contained sildenafil citrate;

o.    When a potential distributor informed defendants that tests had detected the presence of sildenafil citrate in Vinarol, defendants provided the distributor with a falsified and forged FDA document purporting to show that the FDA had analyzed and given its approval to Vinarol and that Vinarol did not contain sildenafil citrate;

p.    When potential overseas customers informed defendants that tests had detected the presence of sildenafil citrate in Vinarol, which would prevent them from legally purchasing Vinarol, defendants endeavored

to help those customers mask from regulators the presence of sildenafil citrate in Vinarol; and

q.     From on or about February 2002, until on or about April 2003, the exact dates being unknown to the Grand Jury, defendants and others generated revenues from the sale of Vinarol of approximately $7.5 million.

## OVERT ACTS

29.     In furtherance of the aforesaid conspiracy and scheme and artifice to defraud, and to effect the objects of the conspiracy, the defendants and others known and unknown to the Grand Jury committed or caused to be committed one or more of the following overt acts, among others, in the District of Arizona and elsewhere:

a.     On or about January 9, 2002, defendant ISAAC directed a wire transfer from defendant UHP's account at National Bank of Arizona, in the amount of $6,000.00, to Nanjing City Commercial Bank in China, to the credit of the Nanjing Zhenren Health Giving Company ("NZHGC"), for the purchase of sildenafil citrate.

b.     On or about January 30, 2002, defendant ISAAC directed a wire transfer from defendant UHP's account at National Bank of Arizona, in the amount of $30,000.00, to Nanjing City Commercial Bank in China, to the credit of NZHGC, for the purchase of sildenafil citrate.

c.    On or about February 4, 2002, defendant ISAAC directed a wire transfer from defendant UHP's account at National Bank of Arizona, in the amount of $31,380.00, to Nanjing City Commercial Bank in China, to the credit of NZHGC, for the purchase of sildenafil citrate.

d.    On or about February 20, 2002, defendant UHP imported, from NZHGC in China, sildenafil citrate, mixed with other herbal products to mask its color and texture, by falsely describing the product on U.S. Customs Service forms and other documents as "Nutrition Granule" or "Zhen Ren Nutrition Granule."

e.    On or about March 26, 2002, defendant UHP imported, from NZHGC in China, sildenafil citrate, mixed with other herbal products to mask its color and texture, by falsely describing the product on U.S. Customs Service forms and other documents as "Diphosphate" or "Fructose-1,6-Diphosphate."

f.    On or about June 21, 2002, defendant UHP imported, from Gongrong International Limited ("Gongrong") in China, sildenafil citrate, mixed with other herbal products to mask its color and texture, by falsely describing the product on U.S. Customs Service forms and other documents as "Nutritional Granules" or "VASX Nutritional Granule."

g.    On or about June 27, 2002, during a routine FDA establishment inspection of defendant UHP's facility at 2026 West Lone Cactus Drive in Phoenix, Arizona, defendant BRYAN GILLETTE told FDA

inspectors that defendant UHP did not manufacture any drug products and only manufactured dietary supplements, when in fact defendant UHP was manufacturing not only Vinarol with sildenafil citrate but also another product with the drug guaifinesin.

h.    On or about June 28, 2002, at the conclusion of a routine FDA establishment inspection of defendant UHP's facility at 2026 West Lone Cactus Drive in Phoenix, Arizona, defendant ISAAC told FDA inspectors that defendant UHP would register as a manufacturer of drugs and would comply with drug manufacturing regulations when defendant UHP moved to its 2301 West Melinda Lane facility the following month.

i.    On or about September 12, 2002, a shipment from defendants of three seven-tablet boxes of Vinarol, as well as two bottles of Bionate SE and one bottle of Maxstar (other products manufactured and/or sold by defendants), all of which had been ordered from defendant BIONATE's web site, was received by a federal investigator working in an undercover capacity in California via United Parcel Service ("UPS"). The package bore a return address of BIONATE INTERNATIONAL, 3249 E. Harbour Drive, Phoenix, AZ 85034-7227.  The literature for Vinarol stated that the product was a "100% Natural Herbal Formula," that there was "No Doctor's Visit or Prescription Required," and that "Vinarol ™ with VASX ™ are registered trademarks of Ultra Health

Laboratories." Sildenafil citrate was not listed as an ingredient in Vinarol anywhere on the label of the boxes containing Vinarol or anywhere else in the accompanying literature, even though subsequent testing determined that the Vinarol contained sildenafil citrate in an amount similar to that used by Pfizer in Viagra.

j.   On or about October 21, 2002, a shipment from defendants of five two-pill packs of Vinarol, which had been ordered from defendant BIONATE's web site, was received by a federal investigator working in an undercover capacity in Arizona via United States mail. The package bore a return address of B.D.C., 6535 E. Cactus Road, Scottsdale, AZ. The literature for Vinarol stated that the product was a "100% Natural Herbal Formula," that there was "No Doctor's Visit or Prescription Required," and that "Vinarol ™ with VASX ™ are registered trademarks of Ultra Health Laboratories." Sildenafil citrate was not listed as an ingredient in Vinarol anywhere on the label of the boxes containing Vinarol or anywhere else in the accompanying literature, even though subsequent testing determined that the Vinarol contained sildenafil citrate in an amount similar to that used by Pfizer in Viagra.

k.   On or about October 30, 2002, defendants ISAAC and BRYAN GILLETTE were informed by marketing agent A.D. that testing conducted by the South Korean government had confirmed the presence of sildenafil citrate in Vinarol.

l.      On or about October 31, 2002, defendant BRYAN GILLETTE received a facsimile from marketing agent A.D., forwarding a message from a doctor at the Korean customs department, stating that testing of Vinarol had shown the presence of sildenafil citrate.

m.      On or about November 4, 2002, defendant LAURA GILLETTE received an e-mail from marketing agent A.D., referring to a conversation with defendant BRYAN GILLETTE, asking for samples of "the major ingredient" in Vinarol so that potential Korean customers could independently test the substance and determine whether it contained sildenafil citrate.

n.      On or about November 17, 2002, defendant LAURA GILLETTE received an e-mail from marketing agent A.D. requesting that she ensure that defendants ISAAC and BRYAN GILLETTE read the attachment, a document written by a Korean doctor that questioned and critiqued defendants' attempts to explain how Vinarol was different from sildenafil citrate.

o.      On or about November 18, 2002, defendant LAURA GILLETTE forwarded the November 17, 2002 e-mail and attachment from marketing agent A.D. (referenced above) to defendant BRYAN GILLETTE by facsimile.

p.      On or about November 18, 2002, defendant ISAAC directed a wire transfer from defendant UHP's account at National Bank of Arizona, in

the amount of $30,000, to Nanjing City Commercial Bank in China, to the credit of NZHGC, for the purchase of sildenafil citrate.

q.     On or about November 21, 2002, internet retailer Institute for Vibrant Living ("IVL") ordered 100,000 tablets of Vinarol from defendant UHP.  The next day, after learning that Vinarol contained sildenafil citrate, IVL contacted defendant LAURA GILLETTE and cancelled the order.

r.     On or about November 26, 2002, after being informed by a representative of potential distributor Spectrum Distribution that independent testing of Vinarol had determined that Vinarol contained sildenafil citrate as the active ingredient, defendant BIONATE forwarded to Spectrum Distribution a forged FDA document purporting to show that the FDA had determined that Vinarol did not contain sildenafil citrate.

s.     On or about December 2, 2002, defendant LAURA GILLETTE received an e-mail from marketing agent A.D., who asked her to give the e-mail to defendants ISAAC and BRYAN GILLETTE, stating that testing conducted by the South Korean government over two months showed that Vinarol was very comparable to Viagra.

t.     On or about December 4, 2002, defendants ISAAC, BRYAN GILLETTE, and LAURA GILLETTE received an e-mail from

employee D.K. discussing ways to hide the detection of sildenafil citrate in VASX and Vinarol.

u.   On or about December 9, 2002, defendants ISAAC and LAURA GILLETTE received an e-mail from marketing agent A.D., which referred to a conversation with defendant BRYAN GILLETTE, advising of the detection by potential customers in Korea and Japan of sildenafil citrate in Vinarol.

v.   On or about December 9, 2002, defendant ISAAC received a letter from marketing agent A.D. stating that repeated testing in Korea and Japan had determined that Vinarol contained sildenafil citrate.

w.   On or about December 10, 2002, defendant LAURA GILLETTE received an e-mail from marketing agent A.D. asking whether the active ingredient in Vinarol was sildenafil citrate or a proprietary blend of herbs and other natural ingredients.

x.   On or about December 13, 2002, a shipment from defendants of two seven-pill boxes of Vinarol as well as one bottle of Ultrim FX (another product manufactured and/or sold by defendants), all of which had been ordered from defendant BIONATE's web site, was received by a federal investigator acting in an undercover capacity in California via UPS. The package bore a return address of BIONATE INTERNATIONAL, 3249 E. Harbour Drive, Phoenix, AZ 85034. Sildenafil citrate was not listed as an ingredient in Vinarol anywhere on the label of the boxes

containing Vinarol, even though subsequent testing determined that the Vinarol contained sildenafil citrate in an amount similar to that used by Pfizer in Viagra.  The package did not contain any additional literature on Vinarol.

y.  On or about December 19, 2002, defendant LAURA GILLETTE received an e-mail from marketing agent A.D., referring to a telephone call with defendant ISAAC, discussing the need to demonstrate to potential customers in Korea and Japan that Vinarol did not contain sildenafil citrate.

z.  On or about December 29, 2002, defendant LAURA GILLETTE received an e-mail from marketing agent A.D. informing her that testing by potential customers in Korea had again detected the presence of sildenafil citrate in Vinarol.

aa.  On or about December 29, 2002, defendants LAURA GILLETTE and ISAAC received an e-mail from employee D.K. informing them that Pfizer had detected sildenafil citrate in a sample of Vinarol tablets.

bb.  On or about December 30, 2002, defendant LAURA GILLETTE received an e-mail from marketing agent A.D., directed to defendant BRYAN GILLETTE, advising that exhaustive testing by foreign government laboratories indicated that the principal ingredient in Vinarol was sildenafil citrate.

cc.  On or about January 9, 2003, defendant LAURA GILLETTE received an e-mail from marketing agent A.D. advising that testing by the Korean government showed "100% similarity" between Vinarol and sildenafil citrate.

dd.  On or about January 16, 2003, defendant ISAAC directed a wire transfer from defendant JOHNSTON-KEAY'S account at National Bank of Arizona, in the amount of $1,350.00, to Bank of East Asia in China, to the credit of Gongrong, for the purchase of sildenafil citrate.

ee.  On or about January 24, 2003, defendant ISAAC directed a wire transfer from the account of ABL/Ultra Health at National Bank of Arizona, in the amount of $42,415.00, to Bank of East Asia, Dalian branch, in China, to the credit of Gongrong, for the purchase of sildenafil citrate.

ff.  On or about January 29, 2003, a shipment from defendants of two seven-pill boxes of Vinarol, which had been ordered from defendant BIONATE's web site, was received by a federal investigator acting in an undercover capacity in California via United States mail.  The package bore a return address of B.D.C., 6535 E. Cactus Road, Scottsdale, AZ.  Sildenafil citrate was not listed as an ingredient in Vinarol anywhere on the label of the boxes containing Vinarol or anywhere else in the accompanying literature, even though subsequent

testing determined that the Vinarol contained sildenafil citrate in an amount similar to that used by Pfizer in Viagra.

gg.   On or about February 7, 2003, defendant UHP delivered 100,006 tablets of Vinarol to IVL, even though IVL had cancelled its November 21, 2002 order.

hh.   On or about February 22, 2003, defendant UHP caused to be shipped from Phoenix, Arizona, to distributor Len Spektor in Buffalo Grove, Illinois, 9,999 three-tablet packs of Vinarol.

ii.   On or about February 28, 2003, defendant ISAAC directed a wire transfer from defendant JOHNSTON-KEAY'S account at National Bank of Arizona, in the amount of $32,213.81, to Bank of East Asia, Dalian branch, in China, to the credit of Gongrong, for the purchase of sildenafil citrate.

jj.   On or about March 12, 2003, defendant LAURA GILLETTE received an e-mail from marketing agent A.D., which e-mail asked in its subject that it be printed and given to defendants ISAAC and BRYAN GILLETTE, stating that the reason for delays in obtaining foreign approvals for the distribution of Vinarol was the "'sildenafil citrate' problem."

kk.   On or about March 17, 2003, defendants UHP and JOHNSTON-KEAY caused to be shipped from Phoenix, Arizona, to the Denver, Pennsylvania, distribution center of Albertsons, a national grocery

chain, thirty-two cases of Vinarol, sixteen of which contained twelve two-tablet boxes of Vinarol and sixteen of which contained twelve seven-tablet boxes of Vinarol.

ll.    On or about March 17, 2003, defendants UHP and JOHNSTON-KEAY caused to be shipped from Phoenix, Arizona, to the Elk Grove Village, Illinois, distribution center of Albertsons, a national grocery chain, two hundred cases of Vinarol, one hundred of which contained twelve two-tablet boxes of Vinarol and one hundred of which contained twelve seven-tablet boxes of Vinarol.

mm.    On or about March 17, 2003, defendants UHP and JOHNSTON-KEAY caused to be shipped from Phoenix, Arizona, to the La Habra, California, distribution center of Albertsons, a national grocery chain, two hundred and forty cases of Vinarol, one hundred and twenty of which contained twelve two-tablet boxes of Vinarol and one hundred and twenty of which contained twelve seven-tablet boxes of Vinarol.

nn.    On or about March 24, 2003, defendant ISAAC, on behalf of defendant UHP, acknowledged the presence of sildenafil citrate in Vinarol in letters to potential customers in South Korea.

In violation of Title 18, United States Code, Sections 371 and 2.

**COUNTS 2 THROUGH 7**

**(Introducing Misbranded Drugs into Interstate Commerce)**

30.     The factual allegations in paragraphs 1-24, 28, and 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

31.     On or about the dates listed below, in the District of Arizona and elsewhere, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand Jury, with the intent to defraud and mislead, introduced and delivered for introduction into interstate commerce and caused to be introduced and delivered for introduction into interstate commerce, as set forth for each Count, the prescription drug sildenafil citrate, which drug was misbranded in one or more of the following ways:

        a.  within the meaning of 21 U.S.C. § 352(a), in that its labeling was false or misleading in any particular; and/or

        b.  within the meaning of 21 U.S.C. § 352(e), in that its label did not bear the established name and quantity of each active ingredient; and/or

        c.  within the meaning of 21 U.S.C. § 352(o), in that it was manufactured, prepared, or processed in an establishment not duly registered under 21 U.S.C. § 360; and/or

d.  within the meaning of 21 U.S.C. § 353(b)(4), in that its label did not bear the symbol "Rx only".

| COUNT | DATE | ITEM |
|-------|------|------|
| 2 | 1/29/03 | Two seven-tablet boxes of Vinarol shipped from Scottsdale, AZ, to a federal investigator acting in an undercover capacity in Alameda, CA |
| 3 | 2/7/03 | One hundred thousand and six tablets of Vinarol delivered to IVL in Phoenix, AZ |
| 4 | 2/22/03 | Nine thousand nine hundred and ninety-nine three-tablet packs of Vinarol shipped from Phoenix, AZ, to Len Spektor in Buffalo Grove, IL |
| 5 | 3/17/03 | Thirty-two cases of Vinarol, sixteen of which contained twelve two-tablet boxes of Vinarol and sixteen of which contained twelve seven-tablet boxes of Vinarol, shipped from Phoenix, AZ, to Albertsons in Denver, PA |
| 6 | 3/17/03 | Two hundred cases of Vinarol, one hundred of which contained twelve two-tablet boxes of Vinarol and one hundred of which contained twelve seven-tablet boxes of Vinarol, shipped from Phoenix, AZ, to Albertsons in Elk Grove Village, IL |
| 7 | 3/17/03 | Two hundred and forty cases of Vinarol, one hundred and twenty of which contained twelve two-tablet boxes of Vinarol and one hundred and twenty of which contained twelve seven-tablet boxes of Vinarol, shipped from Phoenix, AZ, to Albertsons in La Habra, CA |

In violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 352(a), 352(e), 352(o), and 353(b)(4), and Title 18, United States Code, Section 2.

## COUNT 8

### (Failure to Register a Drug Establishment)

32.     The factual allegations in paragraphs 1-24, 28, and 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

33.     Between on or about January 2002 through on or about July 2003, the exact dates being unknown to the Grand Jury, in the District of Arizona and elsewhere, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand Jury, with the intent to defraud and mislead the FDA, operated and caused to be operated an establishment at 2026 West Lone Cactus Drive, Phoenix, Arizona, at which location defendants manufactured, prepared, propagated, compounded, and/or processed a drug or drugs, and which establishment defendants had failed to register with the FDA, as required by 21 U.S.C. § 360.

In violation of Title 21, United States Code, Sections 331(p), 333(a)(2), and 360, and Title 18, United States Code, Section 2.

## COUNT 9

### (Failure to Register a Drug Establishment)

34.     The factual allegations in paragraphs 1-24, 28, and 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

35.     Between on or about July 2002 through on or about July 2003, the exact dates being unknown to the Grand Jury, in the District of Arizona and elsewhere, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand Jury, with the intent to defraud and mislead the FDA, operated and caused to be operated an establishment at 2031 West Melinda Lane, Phoenix, Arizona, at which location defendants manufactured, prepared, propagated, compounded, and/or processed a drug or drugs, and which establishment defendants had failed to register with the FDA, as required by 21 U.S.C. § 360.

In violation of Title 21, United States Code, Sections 331(p), 333(a)(2), and 360, and Title 18, United States Code, Section 2.

## COUNTS 10 THROUGH 15
### (Introducing Misbranded Foods into Interstate Commerce)

36.     The factual allegations in paragraphs 1-24, 28, and 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

37.     On or about the dates listed below, in the District of Arizona and elsewhere, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand Jury, with the intent to defraud and mislead,

introduced and delivered for introduction into interstate commerce and caused to be introduced and delivered for introduction into interstate commerce, as set forth for each Count, the food Vinarol, which food was misbranded within the meaning of 21 U.S.C. § 343(a), in that its labeling was false or misleading in any particular.

| COUNT | DATE | ITEM |
|-------|------|------|
| 10 | 1/29/03 | Two seven-tablet boxes of Vinarol shipped from Scottsdale, AZ, to a federal investigator acting in an undercover capacity in Alameda, CA |
| 11 | 2/7/03 | One hundred thousand and six tablets of Vinarol delivered from Phoenix, AZ, to IVL in Phoenix, AZ |
| 12 | 2/22/03 | Nine thousand nine hundred and ninety-nine three-tablet packs of Vinarol shipped from Phoenix, AZ, to Len Spektor in Buffalo Grove, IL |
| 13 | 3/17/03 | Thirty-two cases of Vinarol, sixteen of which contained twelve two-tablet boxes of Vinarol and sixteen of which contained twelve seven-tablet boxes of Vinarol, shipped from Phoenix, AZ, to Albertsons in Denver, PA |
| 14 | 3/17/03 | Two hundred cases of Vinarol, one hundred of which contained twelve two-tablet boxes of Vinarol and one hundred of which contained twelve seven-tablet boxes of Vinarol, shipped from Phoenix, AZ, to Albertsons in Elk Grove Village, IL |
| 15 | 3/17/03 | Two hundred and forty cases of Vinarol, one hundred and twenty of which contained twelve two-tablet boxes of Vinarol and one hundred and twenty of which contained twelve seven-tablet boxes of Vinarol, shipped from Phoenix, AZ, to Albertsons in La Habra, CA |

In violation of Title 21, United States Code, Sections 331(a), 333(a)(2), and 343(a), and Title 18, United States Code, Section 2.

## COUNTS 16 THROUGH 20

### (Mail Fraud)

38.     The factual allegations in paragraphs 1-24, 28, and 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

39.     Beginning at a time unknown to the Grand Jury, but at least as early as on or about November 2001, and continuing through at least on or about July 2003, in the District of Arizona and elsewhere, defendants, and others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses and representations.

40.     On or about the dates listed below, in the District of Arizona and elsewhere, for the purpose of executing and attempting to execute said scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses and representations, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand Jury, placed and caused to be placed in a post office and authorized depository for mail matter, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited for delivery by commercial interstate carriers, including United Parcel Service, as shown below for each Count, Vinarol, from the District of Arizona, to the locations set forth in the chart below, each such instance being a separate Count of this Indictment.

| COUNT | DATE | QUANTITY OF DRUG | RECIPIENT/ DELIVERY LOCATION | MEANS OF SHIPMENT |
|---|---|---|---|---|
| 16 | 1/29/03 | Two seven-tablet boxes of Vinarol | A federal investigator acting in an undercover capacity in Alameda, CA | United States Postal Service |
| 17 | 2/22/03 | Nine thousand nine hundred and ninety-nine three-tablet packs of Vinarol | Len Spektor in Buffalo Grove, IL | United Parcel Service |
| 18 | 3/17/03 | Thirty-two cases of Vinarol, sixteen of which contained twelve two-tablet boxes of Vinarol and sixteen of which contained twelve seven-tablet boxes of Vinarol | Albertsons in Denver, PA | Commercial interstate carrier |
| 19 | 3/17/03 | Two hundred cases of Vinarol, one hundred of which contained twelve two-tablet boxes of Vinarol and one hundred of which contained twelve seven-tablet boxes of Vinarol | Albertsons in Elk Grove Village, IL | Commercial interstate carrier |
| 20 | 3/17/03 | Two hundred and forty cases of Vinarol, one hundred and twenty of which contained twelve two-tablet boxes of Vinarol and one hundred and twenty of which contained twelve seven-tablet boxes of Vinarol | Albertsons in La Habra, CA | Commercial interstate carrier |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 21 THROUGH 25
### (Wire Fraud)

41.    The factual allegations in paragraphs 1-24, 28, and 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

42.    Beginning at a time unknown to the Grand Jury, but at least as early as on or about November 2001, and continuing through at least on or about July 2003, in the District of Arizona and elsewhere, defendants, and others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses and representations.

43.    On or about the dates listed below, in the District of Arizona and elsewhere, for the purpose of executing and attempting to execute said scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses and representations, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand Jury, transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce the following writings, signs, signals, pictures, or sounds, as shown below for each Count, from or to the District of Arizona, each such instance being a separate Count of this Indictment.

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 21 | 1/16/03 | Wire transfer in the amount of $1,350.00 from Arizona to Gongrong in China |
| 22 | 1/21/03 | Internet purchase of Vinarol from the BIONATE web site in Arizona by a federal investigator acting in an undercover capacity |
| 23 | 1/24/03 | Wire transfer in the amount of $42,415.00 from Arizona to Gongrong in China |
| 24 | 2/28/03 | Wire transfer in the amount of $32,213.81 from Arizona to Gongrong in China |
| 25 | 3/12/03 | E-mail to defendant LAURA GILLETTE in Arizona from marketing agent A.D. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 26

### (Conspiracy to Commit Money Laundering)

44.     The factual allegations in paragraphs 1-24, 28, 29, 40, and 43 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

45.     Beginning at a time unknown to the Grand Jury, but at least as early as on or about November 2001, and continuing through at least on or about July 2003, the exact dates being unknown to the Grand Jury, in the District of Arizona and elsewhere, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., did

knowingly and willfully agree and conspire with each other and others, known and unknown to the Grand Jury, to commit the following offenses against the United States:

a.   to conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity (Smuggling in violation of 18 U.S.C. § 545, Mail Fraud in violation of 18 U.S.C. § 1341, and Wire Fraud in violation of 18 U.S.C. § 1343), with the intent to promote the carrying on of such specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and

b.   within the United States, to knowingly engage and attempt to engage in monetary transactions by, through, and to financial institutions, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity (Smuggling in violation of 18 U.S.C. § 545, Mail Fraud in violation of 18 U.S.C. § 1341, and Wire Fraud in violation of 18 U.S.C. § 1343), in violation of 18 U.S.C. § 1957(a).

## MANNER AND MEANS OF THE CONSPIRACY

46.   The manner and means used by the defendants and others known and unknown to the Grand Jury to carry out the objects of the conspiracy included the following:

a.  Defendants knew that the money and funds received from their sales of Vinarol represented the proceeds of unlawful activity: specifically Smuggling, in violation of Title 18, U.S.C., § 545; Mail Fraud, in violation of Title 18, U.S.C., § 1341; and Wire Fraud, in violation of Title 18, U.S.C., § 1343.

b.  After money and funds were received from customers who purchased Vinarol, the money and funds were routinely deposited into bank accounts of the various entities and individuals. Checks were written against those bank accounts and used to pay the expenses of carrying on the business of the entities and individuals, including purchasing additional ingredients (such as sildenafil citrate) for Vinarol as well as payments to employees and owners of the businesses. These payments were made with the intent to further promote the ongoing unlawful and fraudulent operations.

c.  After money and funds were received from customers who purchased Vinarol, the money and funds were routinely deposited into bank accounts of the various entities and individuals. Funds from these accounts were used to engage in monetary transactions in amounts greater than $10,000.00.

## OVERT ACTS

47.     On or about the following dates, in the District of Arizona and elsewhere, in furtherance of the conspiracy and to effect the objects of the conspiracy, defendants committed and caused to be committed the following overt acts, which consisted of financial transactions into accounts and from accounts as set forth in the chart below:

| Overt Act | Date of Financial Transaction (Financial Institution) | Amount (Payee) | Account Name (Signatory) | Source of Funds or Type of Expense Paid |
|---|---|---|---|---|
| a | 1-9-2002 (wire transfer from National Bank of Arizona) | $6,000.00 (NZHGC) | Ultra Health Products (Acct. No. xxxxxx0302) | Purchase of sildenafil citrate |
| b | 1-30-2002 (wire transfer from National Bank of Arizona) | $30,000.00 (NZHGC) | Ultra Health Products (Acct. No. xxxxxx0302) | Purchase of sildenafil citrate |
| c | 2-4-2002 (wire transfer from National Bank of Arizona) | $31,380.00 (NZHGC) | Ultra Health Products (Acct. No. xxxxxx0302) | Purchase of sildenafil citrate |
| d | 11-18-2002 (wire transfer from National Bank of Arizona) | $30,000.00 (NZHGC) | Ultra Health Products (Acct. No. xxxxxx0302) | Purchase of sildenafil citrate |
| e | 1-16-2003 (wire transfer from National Bank of Arizona) | $1,350.00 (Gongrong) | Johnston-Keay Lab (Acct. No. xxxxxx4958) | Purchase of sildenafil citrate |
| f | 1-24-2003 (wire transfer from National Bank of Arizona) | $42,415.00 (Gongrong) | ABL/Ultra Health (Acct. No. xxxxxx5280) | Purchase of sildenafil citrate |
| g | 2-28-2003 (wire transfer from National Bank of Arizona) | $32,213.81 (Gongrong) | Johnston-Keay Lab (Acct. No. xxxxxx4958) | Purchase of sildenafil citrate |

In violation of Title 18, United States Code, Sections 1956(h) and 2.

## COUNT 27 THROUGH 29

### (Promotional Money Laundering)

48.     The factual allegations in paragraphs 1-24, 28, 29, 40, 43, 46, and 47 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

49.     On or about the dates set forth below, in the District of Arizona and elsewhere, defendants TIMOTHY K. ISAAC, BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES, INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand Jury, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, conducted financial transactions, as set forth in the chart below, which involved the proceeds of specified unlawful activity, namely violations of the smuggling statute, Title 18, United States Code, Section 545, as alleged in Count 1 of the Indictment; the mail fraud statute, Title 18, United States Code, Section 1341, as alleged in Counts 16-20 of the Indictment; and the wire fraud statute, Title 18, United States Code, Section 1343, as alleged in Counts 21-25 of the Indictment; with the intent to promote the carrying on of those specified unlawful activities:

| Count | Date of Financial Transaction (Financial Institution) | Amount (Payee) | Account Name (Signatory) | Source of Funds or Type of Expense Paid |
|---|---|---|---|---|
| 27 | 1-16-2003 (wire transfer from National Bank of Arizona) | $1,350.00 (Gongrong) | Johnston-Keay Lab (Acct. No. xxxxxx4958) | Purchase of sildenafil citrate |

| 28 | 1-24-2003<br>(wire transfer from<br>National Bank of Arizona) | $42,415.00<br>(Gongrong) | ABL/Ultra<br>Health (Acct.<br>No.<br>xxxxxx5280) | Purchase of<br>sildenafil citrate |
|----|----------------------------------------------------------------|--------------------------|--------------------------------------------------|------------------------------------|
| 29 | 2-28-2003<br>(wire transfer from<br>National Bank of Arizona) | $32,213.81<br>(Gongrong) | Johnston-Keay<br>Lab<br>(Acct. No.<br>xxxxxx4958) | Purchase of<br>sildenafil citrate |

In violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

## COUNTS 30-31

### (Monetary Transactions)

50.    The factual allegations in paragraphs 1-24, 28, 29, 40, 43, 46, and 47 of the

Indictment are incorporated by reference and realleged as though set forth fully herein.

51.    On or about the dates set forth below, defendants TIMOTHY K. ISAAC,

BRYAN P. GILLETTE, LAURA C. GILLETTE, ULTRA HEALTH LABORATORIES,

INC., ULTRA HEALTH PRODUCTS, INC., BIONATE INTERNATIONAL, INC., and

JOHNSTON-KEAY LABORATORIES, INC., and others known and unknown to the Grand

Jury, within the United States, knowingly engaged in monetary transactions as set forth

below, in criminally derived property of a value greater than $10,000.00, and which was

derived from specified unlawful activity, namely violations of the smuggling statute, Title

18, United States Code, Section 545, as alleged in Count 1 of the Indictment; the mail fraud

statute, Title 18, United States Code, Section 1341, as alleged in Counts 16-20 of the

Indictment; and the wire fraud statute, Title 18, United States Code, Section 1343, as alleged

in Counts 21-25 of the Indictment:

| Count | Date of Financial Transaction (Financial Institution) | Amount (Payee) | Account Name (Signatory) | Source of Funds or Type of Expense Paid |
|---|---|---|---|---|
| 30 | 1-24-2003 (wire transfer from National Bank of Arizona) | $42,415.00 (Gongrong) | ABL/Ultra Health (Acct. No. xxxxxx5280) | Purchase of sildenafil citrate |
| 31 | 2-28-2003 (wire transfer from National Bank of Arizona) | $32,213.81 (Gongrong) | Johnston-Keay Lab (Acct. No. xxxxxx4958) | Purchase of sildenafil citrate |

In violation of Title 18, United States Code, Sections 1957(a) and 2.

## FORFEITURE ALLEGATION

52.     The factual allegations set forth in Paragraphs 1-24, 28, 29, and 38-51 of this Indictment are incorporated by reference and realleged as though set forth fully herein.

53.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 and as a result of committing one or more of the offenses charged in Counts 1, 16-20 (the mail fraud counts), and 21-25 (the wire fraud counts), the court shall order that the defendants so convicted to forfeit to the United States all property, real or personal, that constitutes or is derived from proceeds traceable to a violation of such offense, or conspiracy to commit such offense.

54.     Pursuant to 18 U.S.C. § 982(a)(1) and (b), each defendant who is convicted of one or more of the offenses set forth in Counts 26 through 31 of this Indictment ( the money laundering offenses) shall forfeit to the United States the following property:  All right, title, and interest in any and all property involved in each offense in violation of Title 18, United States Code, Section 1956 and/or 1957, or conspiracy to commit such offense, for which the defendant is convicted, and all property traceable to such property, including the following:

1) all money or other property that was the subject of each transaction, transportation, transmission, or transfer in violation of Section 1956 and/or 1957; 2) all commissions, fees, and other property constituting proceeds obtained as a result of those violations; and 3) all property used in any manner or part to commit or to facilitate the commission of those violations, including but not limited to the sum of money equal to the total amount of money involved in each offense or conspiracy to commit such offense, for which the defendant is convicted.   If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

55.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Titled 18, United States Code, Section 982(b), and by Title 18, United States Code, Section 981, and Title 28, United States Code, Section 2461(c), each defendant shall forfeit substitute property, up to the value of the amount described above, if by any act or omission of the defendant, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court, has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Sections 545, 981, 982(a)(1) and (b), 1341, and 1343; Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

_____ /S/

FOREPERSON OF THE GRAND JURY
Date:  January 15, 2008

DIANE J. HUMETEWA
United States Attorney
District of Arizona

_____ /S/

PETER S. SEXTON
Assistant U.S. Attorney